IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

**JACQUELINE ROSENBLOOM,**

    **Plaintiff,**

v.                                                            **CASE NO. 3:13-cv-160-RS-CJK**

**DAVID MORGAN in his official capacity as
ESCAMBIA COUNTY SHERIFF; and
SHERIFF'S DEPUTIES, JEREMY CASSADY,
SAM PARKER, CHAD BROWN and MELONY
PETERSON,**

    **Defendants.**
_____/

## ORDER

Before me are Defendants' Motion for Summary Final Judgment (Doc. 151), Rosenbloom's Response in Opposition to the Defendants' Motion for Summary Judgment (Doc. 162), and Defendants' Combined First Motion in Limine and Motion to Strike Testimony Filed in Opposition to Summary Judgment (Doc. 168).

## STANDARD OF REVIEW

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S. Ct. 2505, 2512 (1986). The moving party has the burden of showing the absence of a genuine issue as to

any material fact, and in deciding whether the movant has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

An issue of fact is material "if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Wright v. Sandestin Investments, LLC,* 914 F. Supp. 2d 1273, 1278 (N.D. Fla. 2012). Thus, if reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment. *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)). However, a mere 'scintilla' of evidence supporting the nonmoving party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 251).

## BACKGROUND

I will accept the facts in the light most favorable to the Plaintiff. *See Galvez v. Bruce*, 552 F.3d 1238, 1239 (11th Cir. 2008) (citing *Vinyard v. Wilson*, 311 F.3d 1340, 1343 n.1 (11th Cir. 2002)). "'All reasonable doubts about the facts should be resolved in favor of the non-movant.'" *Id.* (quoting *Burton v. City of Belle*

*Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999); *Clemons v. Dougherty County*, 684 F.2d 1365, 1368-69 (11th Cir. 1982).

On October 29, 2010, Phillip Monier, Plaintiff's ex-boyfriend arrived at Plaintiff's house unannounced and without invitation. Doc. 151. Plaintiff called 911 and explained that Monier had "pushed his way in her house," and that he was outside her locked bedroom door. *Id*. When the 911 operator asked her if it was a "home invasion," Plaintiff agreed. *Id*. She reported that she had suffered bruising from having been grabbed and that her daughter had been shoved as well. *Id*. However, there was never any indication that Monier ever used or threatened deadly force against anyone in the house. *Id*.

At about thirteen minutes into the 911 call there is screaming and the sound of a door being broken down. *Id*. During this chaos, Plaintiff acknowledged that Monier had a gun, and pleaded with him to escort her out and to let her go. *Id*. The deputies encountered Plaintiff's daughter on the way out of the bedroom with her son, and she told them that Monier had a gun and was holding her mother hostage. Doc. 15.

The deputies entered Plaintiff's bedroom, and began screaming. Doc. 151-1. Defendant Cassady shouted to Monier, "[d]on't make me kill you," followed by "I'll blow your goddamn brains out," and the other deputies also began screaming and yelling at the same time. *Id*. In order to de-escalate the situation, Deputy

Hendershott yelled at everyone to "shut up," and without pointing a gun at Monier, talked to him to convince him that the situation could be resolved peacefully. Doc. 15. Hendershott had to leave the room briefly, but he told the other deputies to withdraw and not to fire their guns. *Id*. However, when he left the bedroom, the deputies began to advance on Monier again. *Id*.

During this time, Monier "never by word uttered a verbal threat" to shoot anyone. Doc. 151. Instead, he specifically told the deputies that he did not want to hurt anyone. Doc. 151-1. Moreover, he never threatened to shoot Plaintiff or any of the deputies, he did not remove his gun from his waistband, and he never pointed a gun at Plaintiff or any of the deputies. Doc. 15. While Monier held Plaintiff in front of him, Defendant Cassady yelled to the other deputies that "they were going to need to take a headshot." *Id*. Even though Monier was not fleeing or attempting to escape, and despite the fact that the deputies never even saw a gun, Defendants allege that Monier's actions of possessing a firearm, refusing to follow lawful orders, and holding a person as a human shield were "an inherent and continuous deadly threat until they cease." Doc. 151.

Approximately twenty minutes after Plaintiff called 911, Defendant Cassady fired a shot at Monier's head as Monier briefly looked out from behind Plaintiff, but missed and struck Plaintiff's neck instead. Doc. 15. With regard to his initial shot, Cassady testified that he was approximately 12 to 15 feet away, that his target

(Monier's head) was approximately 4 inches wide, that both Monier and Plaintiff were moving unpredictably and that he hoped to hit Monier "during one of those quick intervals when [Monier] peeked out from around Rosenblooms's head." *Id*. Defendant Cassady then advanced toward Plaintiff and Monier and continued firing. *Id*. After Cassady had fired at least three shots, Monier removed his gun from his waistband and returned fire. *Id*. Through the entire incident, Monier kept Plaintiff "drawn in like . . . he was .. . [wearing] her like a sweater[.]" Doc. 162-1. During the exchange of fire, Plaintiff can distinctly be heard on the 911 tape screaming, "I'm shot! I'm shot!... I'm bleeding! I'm bleeding!...[P]lease stop shooting...[Y]ou are killing me!" Doc. 151-1.

    After taking his initial shots, Defendant Cassady continued firing at Monier and Plaintiff, this time in an effort to try to get out of the situation he created by firing the first shot. Doc. 162-2. Defendant Cassady explained that although he did not want to hit Plaintiff, he was more focused on trying not to hit her somewhere that would kill her. *Id*. After Defendant Cassady began firing, Defendant Parker and Defendant Peterson also fired at Monier and Plaintiff. Doc. 15. By this time though, Monier was further inside the bathroom with Plaintiff—behind a wall and out of the direct line of sight of the deputies. *Id*. Even though no one could see Monier and/or Plaintiff behind the bathroom walls, and even though they knew that Plaintiff was still being held as a shield in front of Monier, Defendant Deputies

fired about 10 shots indiscriminately though the walls. *Id*. During deposition, Plaintiff testified that while the shooting was happening "I heard an officer yell, at one point, the hell with her, what about us." Doc. 162-5.

Peterson testified that she was just shooting at the wall trying to provide cover, and that she knew when firing her weapon that there was some reasonable chance that the hostage might be struck as well as Monier. Doc. 162. Likewise, Defendant Parker began firing despite not being able to see Plaintiff and Monier. Doc. 15. Defendant Parker explained that he made the decision to begin firing even though he could not see Plaintiff or Monier because Defendant Cassady had got shot. Doc. 151.

Plaintiff was struck by five bullets fired by Defendant Deputies. Doc. 15. Plaintiff's injuries included multiple gunshot wounds, including one gunshot wound to the neck, three gunshot wounds to her right leg (with one bullet fracturing her pelvis and vaginal area), and a gunshot wound to her left knee, which shattered the entire knee beyond repair. *Id*. Monier was not struck. *Id*.

Hendershott then entered the bedroom and told the other deputies to hold their fire. *Id*. Monier and the deputies stopped shooting. *Id*. At this time the SWAT team was summoned to the scene. *Id*. Hendershoot asked Monier if he would speak with a negotiator, and Monier agreed. *Id*. Monier surrendered within ten minutes of the beginning of the negotiation. *Id*.

Plaintiff filed her amended complaint alleging Section 1983 claims against Defendant David Morgan, in his official capacity as the Sheriff of Escambia County, and state law claims against Sheriff Morgan and the individual Defendant Deputies. *Id*. Defendants have filed a motion for summary judgment, and Plaintiff has responded.

## ANALYSIS

In Defendants' motion for summary judgment, Defendants argues the following: (1) the granting of qualified immunity to individual officers compel the entry of judgment for Defendant Morgan, (2) the unintended shooting of a hostage with bullets intended for the hostage-taker is not a violation of the hostage's Fourth Amendment rights, and (3) Defendant Deputies did not act maliciously, willfully, wantonly, or with conscious or reckless disregard for Plaintiff's safety. Doc. 151. In response, Plaintiff argues that neither Defendant Morgan or Defendant Deputies are entitled to summary judgment because disputed issues of material fact exist on Rosenbloom's Section 1983 claims against Sheriff Morgan and her state law claims against the Defendant Deputies. Doc. 162.

### I. *Qualified Immunity*

Defendants renew and incorporate their arguments outlined in their motion for judgment on the pleadings. In the December 12, 2014, Order (doc. 150), I applied the well-established law that qualified immunity does not shield an official

sued in his or her official capacity. *See Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 347 (Nov. 10, 2014); *Brandon v. Holt*, 469 U.S. 464, 472 (1985); *Kentucky v. Graham*, 473 U.S. 159, 166-167 (1985); *Mitchell v. Forsyth*, 471 U.S. 511, 556 n.10 (1985); *Owen v. City of Independence*, 445 U.S. 622, 638 (1980); *Lundgren v. McDaniel*, 814 So. 2d 600, 604 (11th Cir. 1987). Because the qualified immunity defense is not available to Defendant Morgan in his official capacity, qualified immunity previously extended to the individual Defendant Deputies does not compel judgment for Defendant Morgan as to Count II.

## II.     Civil Rights Violation Under § 42 U.S.C. 1983

In Count II of Plaintiff's amended complaint, Plaintiff alleges that departmental customs, policies and practices caused Defendant Deputies to violate Plaintiff's rights in violation of the Fourth and Fourteenth Amendments to the United States Constitution. The Fourth Amendment, incorporated to the states by the Fourteenth Amendment, protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court has held that "violation of the Fourth Amendment requires an intentional acquisition of physical control." *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989).

A seizure occurs if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave[.]" *Brendlin v. California*, 551 U.S. 249, 255 (2007). "The intent that counts under the

Fourth Amendment is the 'intent [that] has been conveyed to the person confronted,' and the criterion of willful restriction on freedom of movement is no invitation to look to subjective intent when determining who is seized." *Id.* at 260-61 (internal citations omitted). Therefore, a seizure may occur even when an "unintended person . . . [is] the object of the detention so long as the detention is willful and not merely the consequence of an unknowing act. *Id.* at 254 (citations omitted).

Since *Brower* was decided, in determining whether a person was seized courts have distinguished between circumstances where officers' actions were directed toward the person alleging the Fourth Amendment violation and those where the injury is an unintended consequence of officers' actions. *See Ansley v. Heinrich*, 925 F.2d 1339, 1344 (11th Cir. 1991). The courts have consistently held that an injury sustained in action directed toward a person constitutes a seizure, but an injury sustained in action not directed toward a person does not. Here, Defendants argue that because Plaintiff was not the intended target, Plaintiff was not seized for Fourth Amendment purposes. Doc. 151. Conversely, Plaintiff argues that Defendant Deputies intentionally shot at both her and Monier, thereby seizing her. Doc. 162.

The Eleventh Circuit has not decided whether a hostage used as a human shield who is shot by police is seized for Fourth Amendment purposes, and none of

the cases cited by either Plaintiff or Defendants are directly on point. In support of Defendants' proposition that Plaintiff was not seized, Defendants rely on cases from the First, Second, and Tenth Circuits. The First Circuit in *Landol-Rivera v. Cruz Cosme*, 906 F.2d 791 (1st Cir. 1990), held that a hostage who was shot inadvertently during a police pursuit of a robbery suspect was not seized. *Id.* In *Landol-Rivera,* the suspect held the hostage at gunpoint, commandeered a passing car, and took over the driver's position with plaintiff on his lap. *Id.* at 792. The pursuing offers fired, and a bullet hit plaintiff in the jaw. *Id.* The First Circuit explained that "A police officer's deliberate decision to shoot at a car containing a robber and a hostage *for the purpose of stopping the robber's flight* does not result in the sort of willful detention of the hostage that the Fourth Amendment was designed to govern." *Id.* at 795 (emphasis in original). Citing the Supreme Court, the court recognized that "The Fourth Amendment . . . addresses misuse of power, . . . not the accidental effects of otherwise lawful government conduct." *Id.* (citing *Brower,* 489 U.S. at 595). Therefore, because plaintiff was "not the object of the police bullet that struck him[,]" no seizure occurred. *Id.*

Relying on the analysis in *Landol-Rivera*, in *Medeiros v. O'Connell*, 150 F.3d 164 (2d Cir. 1998), the Second Circuit held that the police officer's accidental shooting of a hostage was not a seizure within the meaning of the Fourth Amendment when the police officers fired into a school van in an attempt to stop

the driver who had commandeered the van. *Id.* The court concluded that the "deflection of the bullet intended for . . . [the hostage-taker] . . . did not transform the troopers' rescue efforts on the hostages' behalf into a seizure." *Id.* at 169.

Finally, in *Childress v. City of Arapaho*, 210 F.3d 1154 (10th Cir. 2000), the Tenth Circuit held that the police officers did not seize plaintiffs within the meaning of the Fourth Amendment when the plaintiffs were held hostage by two escaped prisoners in a minivan, the prisoners fired shots at the officers during a high speed chase, and plaintiffs were injured by return shots fired from the police. *Id.* The Tenth Circuit explained that the "officers intended to restrain the minivan and the fugitives, not" plaintiffs. *Id.* Therefore, the "injuries inflicted were the unfortunate but not unconstitutional accidental effects of otherwise lawful conduct." *Id.* (citing *Brower,* 489 U.S. at 596) (internal quotations omitted).

In all three cases relied upon by Defendants, the injured hostage-plaintiff was not the intended object of the physical restraint (the act of shooting). *See Rucker v. Harford Cnty., Md.*, 946 F.2d 278, 281 (4th Cir. 1991) (Fourth Circuit recognized that a person is seized if he is the intended object of a physical restraint, and not that the "act of restraint itself is intended (here the act of shooting) though it restrains one not intended to be restrained"). Instead, the police officers intended to shoot through a moving vehicle to restrain the vehicle and the suspect, not the hostages. *See Landol-Rivera*, 906 F.2d at 791 (officers shoot through a car

containing suspect and hostage), *Medeiros*, 150 F.3d at 164 (officers shoot through a school van containing suspect and hostage), *Childress*, 210 F.3d at 1154 (officers shoot through minivan containing suspect and hostage). None of these cases address whether a plaintiff/hostage is seized for Fourth Amendment purposes when the police officers intend to shoot *through a hostage* used as a human shield to restrain the suspect.

More recent, the Eastern District of Virginia recognized this distinction. In *Lee v. Williams,* the court found that the "undisputed evidence is that Lee was not in any way used as a "human shield" at the time that Deputies Clem and Barley opened fire on Desmond Vaughan, and consequently no "seizure" occurred." *Lee v. Williams*, 138 F. Supp. 2d 748, 758 (E.D. Va. 2001). Although the hostage's location was disputed, it appeared that he was already on the ground or chest-high to the suspect at the time he heard the first exchange of gunfire between the deputies and the suspect, some thirty to forty yards away from the hostage. *Id.* at 759. Therefore, because the plaintiff/hostage was "neither blocking nor shielding" the suspect in any way at the time of the shooting, he "was not the object of the shooting and his injuries instead resulted from the unintended consequences" of the deputies' actions. *Id.*

Prior to discovery, and using an Eighth Circuit case as instructive, in the August 13, 2013, Order I held that if officers shoot toward a suspect and a person

being held as a human shield in a manner that is substantially certain to strike the hostage, a seizure of the hostage takes place under the Fourth Amendment. *See Craighead v. Lee*, 399 F.3d 954 (8th Cir. 2005); Doc. 32. I also stated that "It is plausible that in this case, an expert could testify that the shots fired by deputies would hit both Monier and Plaintiff." Doc. 32. After further consideration of the law, it is not necessary for a plaintiff/hostage to prove that she was "substantially certain" to be shot. Instead, the test articulated by the Supreme Court is that a seizure occurs if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave[.]" *Brendlin v. California*, 551 U.S. 249, 255 (2007). The plaintiff must be the intended object of the act of restraint.

It is now undisputed that Plaintiff was not merely near Monier when Defendant Deputies began shooting, and that Defendant Deputies did not merely shoot toward Plaintiff's location. Deputy Cassidy described Monier as "wearing Plaintiff like a sweater," and that although he knew he may shoot Plaintiff, he was trying to shoot her in a manner that would not kill her. Additionally, Deputy Cassady testified that he was approximately 12 to 15 feet away, that his target was approximately 4 inches wide, that both Monier and Plaintiff were moving unpredictably and that he hoped to hit Monier, not Plaintiff. If a hostage is the intended object of the shooting, whether the hostage is actually shot or not, the

hostage has been seized for purposes of the Fourth Amendment. Considering the evidence in the light most favorable to the Plaintiff, there are facts on the record that a reasonable jury could find that the Defendant Deputies intended to shoot through Plaintiff in order to restrain Monier. Therefore, Plaintiff was the intended object of the shooting.

Existence of a Fourth Amendment seizure is not enough for § 1983 liability. *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989). The seizure must also be unreasonable. *Id.* The Eleventh Circuit has held that the "Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) (citing *Graham v. Connor,* 490 U.S. 386, 394–95 (1989)). Looking at the totality of the circumstances, a court must ask "whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Id*.

Apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). In *Tennessee v. Garner,* the Supreme Court held that "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id.* at 11. There is evidence on the record that support a finding that

Monier did not pose an immediate threat to the officers or to Plaintiff when Defendant Cassady began shooting at Monier and Plaintiff. Monier never removed his gun, he did not threaten the officers or plaintiff, and he was not attempting to escape. Moreover, Plaintiff, who was also seized, did not pose an immediate threat to the officers or to others. Accordingly, a reasonable trier of fact could find that the use of deadly force under these circumstances was unreasonable.

Because it was unnecessary for me to consider the expert report of Lewis Battle to determine that Plaintiff was seized for purposes of the Fourth Amendment, the relief requested in Defendants' Combined First Motion in Limine and Motion to Strike Testimony Filed in Opposition to Summary Judgment (Doc. 166) is denied in part.

### III.   *State Law Claims*

In Counts IV and V of Plaintiff's Amended Complaint (Doc. 15), Plaintiff alleges gross negligence and battery against Defendants Cassady, Peterson, and Parker. Specifically, Plaintiff alleges that the Defendant Deputies acted maliciously, willfully, wantonly, or with conscious or reckless disregard for Plaintiff.

For a tort claim under Florida law, the exclusive remedy "for injury or damage suffered as a result of an act, event, or omission of an officer, employee, or agent of the state . . . shall be by action against the governmental entity, or the head

of such entity in . . . his official capacity[.]" Fla. Stat. Ann. § 768.28.  However, if "such act or omission was committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property[,]" then an employee of the state may be held personally liable in tort for any injury or damage as a result of any act, event, or omission. *Metro. Dade Cnty. v. Kelly*, 348 So. 2d 49, 50 (Fla. Dist. Ct. App. 1977) (*citing* Fla. Stat. Ann. § 768.28(9)).

Taking the evidence in the light most favorable to Plaintiff, there is evidence of wanton and willful disregard for the safety of Plaintiff. It is undisputed that upon arriving to the room, Defendant Cassady shouted to Monier, "[d]on't make me kill you," followed by "I'll blow your goddamn brains out." Additionally, the Defendant Deputies fired shots indiscriminately at Plaintiff and Monier, even before Monier began shooting and even after both Plaintiff and Monier were concealed behind a wall. Although Defendant Deputies testified they did not want to shoot Plaintiff in a manner that would kill her, they did testify they knew they could injure her. Lastly, Plaintiff testified she heard an officer yell "the hell with her[.]" All of this evidence supports a finding that by exercising an unreasonable use of deadly force against a suspect and a hostage used as a human shield, the Defendant Deputies were acting in a manner that exhibited a wanton and willful disregard of the human rights and safety of Plaintiff.

## **CONCLUSION**

The relief requested in Defendants' Motion for Summary Final Judgment (Doc. 151) is **DENIED**, and the relief requested in Defendants' Combined First Motion in Limine and Motion to Strike Testimony Filed in Opposition to Summary Judgment (Doc. 166) is **DENIED in part**.

**ORDERED** on January 22, 2015.

                                            **/s/ Richard Smoak**
                                            **RICHARD SMOAK**
                                            **UNITED STATES DISTRICT JUDGE**